(127 So. 257)
**CITY OF MOBILE et al. v. LARTIGUE.**
I Div. 886.

Court of Appeals of Alabama.
March 25, 1930.

Vincent F. Kilborn, of Mobile, for appellants.

Robert T. Ervin, Jr., and Pillans, Cowley & Gresham, all of Mobile, for appellee.

RICE, J.

William A. Lartigue owned or leased property adjacent to the municipal airport of the city of Mobile, and sued the city of Mobile and John R. Peavy, a city engineer, for damages, claiming in short that, although the lands in his possession were lower than the airport, so that the surface water drained naturally from the airport over his ground, the city, in attempting to drain the airport, had caused water to be discharged upon his field in much greater quantities than the natural flow of the water from the dominant to the servient tenement, with the result that a crop of snap beans which the plaintiff had was ruined, when ready for market.

The suit was tried by a jury in the circuit court of Mobile county, resulting in a judgment for the plaintiff against both defendants for $350 damages, and from this judgment they each prosecute the present appeal and separately assign errors.

The city of Mobile, prior to the happening of the matters out of which this lawsuit grows, had set up and was operating the municipal airport some three miles south of the city of Mobile. In and about the operation of this airport, the city of Mobile dug certain ditches. In the employ of the city of Mobile was the defendant John R. Peavy, and it was he who, as such engineer, directed the digging of the ditches and the location of them; and it was these ditches which were alleged to have caused appellee's injuries.

Earnest insistence is made here that the city of Mobile, in operating the airport, was engaged in the performance of what is known as a "governmental function," and hence not liable in damages for the torts, or negligent acts, of its agents or servants, acting in or about the operation of same.

■■ It is thought by us that the distinction between so-called "governmental" acts, for negligence in the doing of which municipal corporations are not liable, and so-called "corporate" or "ministerial" acts, for negligence in the doing of which municipal corporations are liable after the same manner of private corporations or private persons, may be stated thus: Those acts which are done by a municipal corporation in the exercise of powers for the benefit of the people generally, as an arm of the state, enforcing general laws made in pursuance of the general policy of the state, are "governmental"

acts, from the negligent manner of doing which no liability flows; while those acts which are done in the exercise of the powers of the municipal corporation for its own benefit, or for the benefit of its citizens alone, or the citizens of the municipal corporation and its immediate locality, are corporate or ministerial actions which are governed by the same rules that govern private corporations.

Within the first group, and illustrating its thought, are acts done in policing, in furtherance of the public health and safety (as the maintenance of hospitals, pest houses, and the like), in the operation of parks or recreation centers, in maintaining charitable institutions, and in maintaining penal institutions. For acts done in any of these capacities, no liability arises.

Illustrations of the second branch are acts done with reference to public streets, waterworks, light plants, sewers, ditches, and like public utilities.

The authorities we cite enable a statement of the rule and illustrate both branches, to wit: Williams v. City of Birmingham, 219 Ala. 19, 121 So. 14; City of Tuscaloosa v. Fitts, 209 Ala. 635, 96 So. 771; Hillman v. Anniston, 214 Ala. 522, 108 So. 539, 46 A. L. R. 89; Lampton v. Wood, 199 Ky. 250, 250 S. W. 980; Sisco v. Huntsville (Ala. Sup.) 124 So. 95;[1] City of Birmingham v. Whitworth, 218 Ala. 603, 119 So. 841; Eufaula v. Simmons, 86 Ala. 515, 6 So. 47; Arndt v. Cullman, 132 Ala. 540, 31 So. 478, 90 Am. St. Rep. 922; Twyman's Adm'r v. Frankfort, 117 Ky. 518, 78 S. W. 446, and see opinion at 446, 447, 64 L. R. A. 572, 4 Ann. Cas. 622.

In the Eufaula and the Cullman Cases cited just above, actions were sustained against municipal corporations for flooding the lower tenement in contravention of the law of dominant and servient tenements.

An examination of the authorities just cited, and the numerous cases cited in the opinions in those decided by our own Supreme Court, will reveal that we have had numerous cases in Alabama against cities for alleged tortious conduct, when the liability of the city depended upon the question of whether it was then engaged in a corporate function, or a public and governmental function, holding—in line with what seems to be everywhere the law—that it is liable when engaged in a corporate function and not liable when engaged in a public and governmental function. We do not seem to have had a case in Alabama when the acts in question related to the operation of a municipal airport. Indeed, we have been unable to find one in the reports of any of the states.

True, we have found a few adjudications bearing upon the general subject of the op-

eration of airports by municipalities—and at least one of these would seem to indicate that the court rendering the decision in the case *would* hold, if it did not therein hold, that the city, in the operation of the airport, was engaged in the performance of a "governmental act." City of Wichita v. L. W. Clapp et al., 125 Kan. 100, 263 P. 12, 14, 63 A. L. R. 478. But, as indicated by the learned annotater, who wrote the note appended to the report of this case in 63 A. L. R. page 484, the decision is somewhat "unique." At any rate, we do not consider it *directly* opposed to the holding we shall presently announce; and, if it were, we would not be persuaded thereby that we were in error.

Another case that would seem to indicate that the court rendering the decision holds to a view, on the particular question we are discussing, different from our own, is that of Dysart v. City of St. Louis (Sup. Ct. of Missouri) 11 S.W.(2d) 1045, 62 A. L. R. 762. We may make the same comment on this case that we have made hereinabove on the Wichita v. Clapp Case.

If there is an apposite decision of the Supreme Court of our state on the question, we, of course, are bound thereby. Code 1923, § 7318. But we have been able to find no such decision, so we "choose our own path."

"Aeronautical development emphasizes the vital importance of 'airways,' an essential element of which is the landing field or airport. The term 'airway' applies to air routes for either airplanes or seaplanes. An airway is far more than a mere air line. It is a material and permanent way through the air, laid out with the precision and care that an engineer adopts in choosing the course of and laying down of a railway. Whether over land or water, it is essentially on the ground. Its existence and general layout depend almost entirely upon the commercial demand. The primary requisite of an airway is that it shall be safe, reliable, and regular. These attributes can be gained only if it is adequately laid out and equipped, and first and foremost of these attributes are airports or landing fields. * * * The maintenance of airports, however, comes legitimately within the scope of the municipality in much the same manner as docks and harbor facilities for marine shipping. Airports are said to be as important to commerce as are terminals to railroads or harbors to navigation. * * * The possession of the airport by the modern city is essential if it desires opportunities for increased prosperity to be secured through air commerce." Wichita v. Clapp, supra. Quoted in Dysart v. St. Louis, supra.

We approve the quoted language just set out. It would seem almost superfluous to add that we are convinced thereby, or convinced, and hold, that an airport, *the* airport, in this case, is essentially a part of the city's (Mo-

[1] 220 Ala. 59.

bile's) system of transportation facilities. The art of getting from place to place is now exercised by passage through the air as well as along the surface of the earth and on the waters of the earth. An airport is a true analogy to a railway station, or a bus terminal. It bears no longer, if it ever bore, any of the essential characteristics of a public playground or recreation park.

The authorities are uniform in holding that work done by a city in connection with the building, repair, and maintenance of its streets is done in a corporate or ministerial capacity, as distinguished from a governmental capacity. This thought is restated in the Williams v. City of Birmingham Case, supra, relied upon here so strongly by the appellant city of Mobile. Streets are portions of the earth's surface, graded, and, in large part, hard-surfaced or paved in order to facilitate transportation from one place to another within the corporate limits. Airports are landing and taking off places for airplanes which traverse the air instead of, as automobiles and horse-drawn vehicles and railway trains, the land. As stated, they are essentially and primarily an incident to transportation.

As already indicated, we are of the opinion that appellant city of Mobile, in acquiring and operating the airport in question, displayed a commendable degree of foresight and spirit of progress. But in its operation it is engaged in a purely corporate capacity.

■ In respect of its purely business relations (as here) as distinguished from those that are governmental, a municipal corporation is held to the same standard of just dealing that the law prescribes for private individuals or corporations. Then (now) the municipality acts for the private advantage of the inhabitants of the city, and to a certain extent for the city itself. 43 C. J. 183.

■ If a function undertaken by a municipal corporation is commercial in its nature, the corporation is not exonerated from liability by the fact that its operations are not, or cannot be, profitable. 19 R. C. L. 1112.

■ So, we hold that the grounds of appellant city of Mobile's demurrer to the complaint, taking the point that the city was shown to be, at the times in question, engaged in the performance of a "governmental act," etc., and hence not liable, were properly overruled.

■ It seems, and we hold it is, thoroughly established in this state (as well as in most, if not all, other states) that the servitude of the lower tenement to the dominant tenement, with reference to surface waters, extends only to surface waters flowing in their natural channels, and does not authorize the proprietor of the dominant tenement to collect the water into drains or artificial channels and precipitate it in increased quantity and volume upon the lower land to its injury and detriment. Crabtree v. Baker, 75 Ala. 91, 51 Am. Rep. 424; Walshe v. Dwight Mfg. Co., 178 Ala. 310, 59 So. 630; Atlantic Coast Line R. R. Co. v. Woolfolk, 178 Ala. 190, 59 So. 633; King Land Co. v. Bowen, 7 Ala. App. 462, 61 So. 22; Note, 85 Am. St. Rep. 730.

Appellants insist that the trial court committed reversible error in overruling their demurrers to counts 3 and 4, separately, because, as we understand their contention, neither of said counts averred that "water had been cast on plaintiff's (appellee's) lands, which theretofore flowed in a different direction, or upon the lands of third parties," etc. They rely upon the decision of the Supreme Court in the case of Hughes v. Anderson, 68 Ala. 280, 44 Am. Rep. 147, and of this court in the case of King Land Co. v. Bowen, supra, for support of their contention. We are not persuaded. If the holding of the Supreme Court in the Hughes v. Anderson Case can be construed as supporting appellants' argument, it is out of harmony with, and in effect overruled by, the later holding of the Supreme Court in the opinion in the case of Crabtree v. Baker, supra, from which we quote what we conceive to be the established law, in this state, upon the subject, to wit: "The burden resting upon the lower land is to receive from the higher land the water which flows therefrom naturally *without the art of man* (emphasis ours); the water which comes to it because of its natural depression. There is no right in the owner of the higher land, by artificial construction designed for its improvement, relieving it from its natural disadvantages, to increase the burdens of the lower estate. Hurdman v. N. E. Railway Co., 3 C. P. Div. 168; Gould on Waters, § 267; Angell on Water Courses, § 108; Cooley on Torts, p. 579–80. And if he collects surface water into an artificial channel, casting it in a body upon the lower land, it is an actionable tort" (and the writer of the opinion quoted from, at this point, cites, as sustaining authority, the case of Hughes v. Anderson, supra, indicating to us that he did not place upon the holding in it the same construction now contended for here by appellant's able counsel).

Our conclusion that the law is, as we have quoted from the opinion in the Crabtree v. Baker Case, supra, fortified by an examination of the holding in each of the following cases: Atlantic Coast Line R. R. Co. v. Woolfolk, supra; Walshe v. Dwight Mfg. Co., supra; and King Land Co. v. Bowen, supra, wherein this court specifically called attention to the restriction made by the later cases, on the holding (contended for by appellants) in the case of Hughes v. Anderson, supra.

Further discussion would seem profitless, and we hold that the demurrers by appellants, separately, to counts 3 and 4, were properly overruled.

Written charges 8, 17, C, and 7, requested by appellants, were properly refused, in view of what we have said in the next three preceding paragraphs, and specifically upon the authority of the holding in King Land Co. v. Bowen, supra.

■ Written charge B, requested by appellants, was properly, refused, because the substance of same was fully given to the jury in the learned trial judge's excellent oral charge.

What we have already said hereinabove will indicate our reasons for holding, as we do hold, that there is no merit in the exception · reserved to the specified portion of the oral charge of the court.

■ There was no error in overruling appellants' objection to the question to the witness Jeanne Dunklin as to the change made in the "ditching" by appellants, after the flooding of the appellee's "bean patch." Nor in refusing to exclude her answer. The admission of this evidence was not governed by the principles of law laid down in the case of Ala. Great So. Rwy. Co. v. Ensley Transfer & Supply Co., 211 Ala. 298, 100 So. 342, and the other cases cited by appellants, but was directly controlled by the holding of our Supreme Court in the case of So. Rwy. Co. v. Lewis, 165 Ala. 555, 51 So. 746, 138 Am. St. Rep. 77. So, on the authority of the holding in the So. Rwy. Co. v. Lewis Case, just cited, it was proper to allow the testimony of the witness Jeanne Dunklin and of the plaintiff as to their conversations with the men doing the "ditching" in question, at the time it was being done.

What we have written disposes of all the questions argued by appellants, and, finding nowhere any prejudicial error, the judgment appealed from will be, and is, affirmed.

Affirmed.

